UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

Howard J. Comparon,

    Plaintiff,

v.

Michael J. Astrue,
Commissioner of Social Security
Administration,

    Defendant.

Case No. 2:11-CV-486-JVB

**OPINION AND ORDER**

Plaintiff Howard J. Comparon seeks judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security, who denied his applications for Disability Insurance Benefits and Supplemental Security Income disability benefits under the Social Security Act. For the following reasons, the Court affirms the Commissioner's decision.

**A. Procedural Background**

On January 9, 2007, Plaintiff applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income disability ("SSI") benefits, alleging disability beginning on April 30, 2004. (R. at 182–192.) His claims were denied initially (R. at 110–117), as well as upon reconsideration on August 28, 2007 (R. at 122–128, 131–137). On September 18, 2007, Plaintiff requested a hearing before Administrative Law Judge Marlene R. Abrams ("ALJ"). (R. at 138–141.) This hearing was held via video conference on February 19, 2010. (R. at 32.) On May 21, 2010, the ALJ determined that Plaintiff was not disabled and thus was not entitled to the benefits.

(R. at 14–26.) Her opinion became final when the Appeals Council denied Plaintiff's request for review on October 20, 2011. (R. at 1–3.)

**B. Factual Background**

**(1)** *Plaintiff's Background and Testimony*

Plaintiff was born in 1951. (R. at 42.) His highest education was eighth grade, where he took some special education classes. (R. at 42–43.) In the 1970s, Plaintiff was shot in the left thigh, resulting in "very severe nerve damage," including loss of feeling in the bottom of his foot. (R. at 66.) In the 1980s, Plaintiff had another accident where a car fell off a jack stand and crushed his left ankle. (*Id.*) His ankle now contains a 3.5-inch screw. (*Id.*)

From 1985 to 2004, Plaintiff worked in automobile sales (R. at 45). His commission-based income varied annually: $58,000 in 1998; $42,000 in 1999; $54,000 in 2000 and 2001; and $34,000 in 2002 and 2003. (R. at 44.) Plaintiff testified that he was fired in 2003 because he could not work the expected twelve hours per day, six days per week. (R. at 43–44.) He made $4,400 at another dealership in 2004 before he was terminated in April. (R. at 43, 69.) On the Social Security Administration Work History Report, Plaintiff called himself a salesman and a manager who supervised twenty employees. (R. at 269.) However, at the ALJ hearing on February 19, 2010, he testified that he was not a manager, did not supervise his co-workers, and never had the authority to hire or fire anyone. (R. at 46–47.)

Plaintiff worked in two different sales settings: "up," where employees worked with customers in turn; and "open floor," where the first salesman to reach each customer got to attempt the sale. (R. at 48.) In an up system, Plaintiff sat at a desk waiting for his assigned

customer to arrive, but in an open floor system, he stood by the front door, ready to race his co-workers to the arriving customers. (R. at 49.) Plaintiff always worked in open floor dealerships, except for one year before 2001. (R. at 50–51.) At these jobs, he also moved cars around the lots, brushed snow off cars, pushed cars out of snow ruts, and decorated the sales floors with displays, lifting up to thirty pounds. (R. at 51–52.) In April 2004, Plaintiff was terminated because the dealership "didn't need [his] services anymore." (R. at 69.) However, he admitted to having trouble meeting the sales quotas because "it was hard for me to get a customer. I couldn't out race the young guys." (R. at 70.)

When asked, "[w]hat … changed in 2004 that you no longer felt you could do the job as a sales person," Plaintiff responded, "[t]he pain got extremely large in my back and my walking and I would fall a lot, my balance. . . . It started way before that but I couldn't handle the pain anymore." (R. at 52.)

As of February 2010, Plaintiff lived with his girlfriend in a tri-level house. (R. at 61, 63.) The residence had fourteen stairs, with seven steps separating each level. (R. at 61–62.) He testified that he avoided taking the stairs, even if something he needed was on another floor, because he often ran out of breath and fell on the stairs. (R. at 65.) Instead, he asked his girlfriend to retrieve things so that he only traveled up and down the stairs twice each day. (R. at 68.) His girlfriend also shopped for groceries, unloaded the dishwasher, took out the trash, did laundry, dusted, and cooked. (R. at 64–65.) Plaintiff handled his own personal grooming, placed dishes in the dishwasher, and did simple tasks like turning on the coffee pot. (R. at 63–65.)

Most days, Plaintiff just watched television at home, but sometimes he went out for breakfast with his girlfriend, drove to visit his grandchildren, or had his children visit him. (R. at 63–64.) In nice weather, Plaintiff walked in the park across from his house. (R. at 68.) He would

walk for three minutes at a time before stopping to sit on a bench. (*Id.*) He then sat for three or four minutes before getting up again. (R. at 68–69.) Between 2006 and 2010, Plaintiff went to physical therapy twice a week. (R. at 57.) If he drove, he was there for two hours, but if the van picked him up, he would be there for eight hours. (R. at 64.) He also testified that he only got four to five hours of broken sleep per night, although he slept up to five hours straight using the CPAP[1] machine. (R. at 66–67.)

**(2)** *Medical Evidence*

Plaintiff first saw a doctor for back pain in 2006, when his Medicaid coverage began. (R. at 53, 58.) Previously he took Aleve tablets throughout the day, took prescription blood pressure medication (R. at 53), and, when not at work, used a cane bought from a drugstore (R. at 71).

Between 2006 and 2010, Plaintiff saw a variety of doctors, but primarily Dr. Kishan Chand. In November 2006, Dr. Chand reviewed x-rays of Plaintiff's spine and knees. (R. at 334, 336.) He diagnosed Plaintiff with osteoarthritis[2] of the knees and lumbar spine, degenerative disc disease[3], and lumbar radiculopathy[4]. (R. at 335.) He recommended physical therapy and pain medication. (R. at 336.) For the next four years, Plaintiff went twice weekly for physical therapy,

---

[1] CPAP—continuous positive airway pressure—treats moderate to severe sleep apnea by delivering air pressure through a mask in order to keep the airways open during sleep. *Sleep apnea, Treatments and drugs*, Mayo Clinic, http://www.mayoclinic.com/health/sleep-apnea/DS00148/DSECTION=treatments-and-drugs (last updated June 24, 2012).

[2] "Osteoarthritis is the most common form of arthritis, affecting millions of people around the world. Often called wear-and-tear arthritis, osteoarthritis occurs when the protective cartilage on the ends of [the] bones wears down over time." *Osteoarthritis*, Mayo Clinic, http://www.mayoclinic.com/health/osteoarthritis/DS00019 (last updated Oct. 13, 2011).

[3] Degenerative disc disease is "the development of pain in a dis[c] as a result of normal wear and tear." *Back surgery: When is it a good idea?*, Mayo Clinic, http://www.mayoclinic.com/health/back-surgery/HQ00305 (last updated July 7, 2011).

[4] Radiculopathy is "the irritation and inflammation of a nerve caused by a herniated dis[c]." *Id.*

including back ultrasounds, back massages, and TENS machine treatment[5]. (R. at 57.) He took naproxen[6] and Darvocet[7] daily and methocarbamol[8] as needed. (R. at 55.) He also used canes prescribed by Dr. Chand for walking and for bracing himself to get in and out of chairs. (R. at 56, 71.)

On March 7, 2007, Dr. M. Siddiqui examined Plaintiff for the State agency, noting tenderness of the left thigh and ankle and lower back and decreased range of motion in the left knee and ankle and lower back. (R. at 349.) He also found a "mildly swollen" left ankle, no swelling in the knees or left shoulder, and clear lungs. (*Id.*) Dr. Siddiqui's overall impressions included left ankle pains and left foot numbness, both attributed to the left ankle crushing injury and left thigh gunshot wound; a history of osteoarthritis; generalized joint pain; fungal toenails; and insomnia. (R. at 50.)

On March 30, 2007, Dr. D. Neal completed a residual functional capacity ("RFC") questionnaire for the State agency, finding that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, push or pull without additional limitations, stand or walk six hours in an eight-hour workday, and sit six hours in an eight-hour workday. (R. at 354.) He advised that Plaintiff never climb ladders, ropes, and scaffolds and only occasionally climb ramps and stairs, but he could frequently balance, stoop, kneel, crouch, and crawl. (R. at 355.)

---

[5] "Transcutaneous electrical nerve stimulation (TENS) is a therapy sometimes used to treat localized or regionalized pain. During TENS therapy, electrodes deliver electrical impulses to nearby nerve pathways—which can help control or relieve some types of pain." *TENS therapy: An option for fibromyalgia treatment?*, Mayo Clinic, http://www.mayoclinic.com/health/tens/AN01946 (last updated Feb. 3, 2011).

[6] Naproxen (brand name Aleve) treats mild to moderate pain and relieves symptoms of arthritis such as inflammation, swelling, stiffness, and joint pain. *Naproxen (Oral Route)*, Mayo Clinic, http://www.mayoclinic.com/health/drug-information/DR602223 (last updated Nov. 1, 2012).

[7] Darvocet relieves mild to moderate pain, but it was banned in the United States in November 2010 due to abnormal or fatal effects on heart rhythm. *FDA News Release: Xanodyne agrees to withdraw propoxyphene from the U.S. market*, U.S. Food and Drug Administration (Nov. 19, 2010), http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm234350.htm.

[8] Methocarbamol (brand name Robaxin) "relieve[s] the discomfort caused by acute (short-term), painful muscle or bone conditions." *Methocarbamol (Oral Route)*, Mayo Clinic, http://www.mayoclinic.com/health/drug-information/DR602703 (last updated Nov. 1, 2011).

On July 18, 2007, Dr. Chand and Physician's Assistant Daud Rashidi found decreased pain and "very mild tenderness" in Plaintiff's left shoulder; decreased pain and "very slight tenderness" with limited range of motion in the left ankle; and "mild stiffness, minimal swelling, and mild patellofemoral crepitus[9]" with limited range of motion in the knees. (R. at 388.) Nonetheless, Plaintiff reported—on a ten-point scale—knee pain of five to seven and back pain of six to seven. (*Id.*) The overall diagnoses were osteoarthritis of the lumbosacral spine, lumbar radiculopathy, periarthritis of the left shoulder, chondromalacia patella[10] of both knees, and osteoarthritis of the left ankle. (R. at 389.) Dr. Chand and P.A. Rashidi recommended continuing the current treatment of pain medication and physical therapy and declared Plaintiff disabled from work. (*Id.*)

On September 7, 2007, Dr. Chand completed an RFC questionnaire, identifying Plaintiff's objective signs as reduced range of motion in the lower back, knees, left ankle, and left shoulder; sensory changes at L5; tenderness; trigger points; swelling of the knees, left ankle, and left shoulder; muscle spasm; muscle weakness; and positive straight leg raising. (R. at 397.) Dr. Chand noted that Plaintiff's pain would "often" interfere with attention and concentration, and he could only walk one city block without resting or experiencing severe pain, sit for one to two hours, and stand or walk thirty minutes at a time. (R. at 398–399.) Dr. Chand answered many questions with no explanation beyond, "pt. [patient] is disabled at the present time." (R. at 398–401).

Plaintiff's physician Dr. Walter McFarland made similar findings in his November 12,

---

[9] Crepitus—or crepitation—is "a grating or crackling sound or sensation . . . produced by the fractured ends of a bone moving against each other," such as "crepitation in the arthritic knee." *Crepitation*, Merriam-Webster, http://www.merriam-webster.com/medical/crepitation (last visited Mar. 22, 2013).

[10] Chondromalacia patellae is "pain over the front of the knee with softening of the articular cartilage of the patella." *Chondromalacia patellae*, Merriam-Webster, http://www.merriam-webster.com/medical/chondromalacia%20patellae (last visited Mar. 22, 2013).

2008, RFC questionnaire, including that of present disability. (R. at 468–470.) Two days before, he diagnosed Plaintiff with osteoarthritis of the neck, shoulders, back, and knees, suggesting that Plaintiff keep taking prescription medications for pain relief, muscle relaxation, high blood pressure, and high cholesterol. (R. at 447.)

On March 19, 2009, Dr. Chand found "mild tenderness," "minimal swelling," and stiffness in Plaintiff's left shoulder and spine, as well as "mild muscle spasms" in his back. (R. at 538.) He continued to deem Plaintiff disabled and to recommend the current treatment. (R. at 539.) Plaintiff reported—on a scale of one through ten—pain of five in his left shoulder, five in his cervical spine, and six in his lumbosacral spine, plus neck pain. (R. at 538.) On August 24, 2009, Dr. Chand again saw Plaintiff, noting high blood pressure and cholesterol; "[a]sthma [that] is quite serious;" use of a walking cane; and pain, tenderness, and decreased range of motion in the lumbar spine and left hip, knee, ankle, and shoulder. (R. at 552–554.) Dr. Chand opined that Plaintiff was still disabled due to "[m]arked weakness of the left lower extremity, footdrop of the left foot[11], . . . diminished sensations[,] . . . [l]umbar strain with lumbar radiculopathy[,] . . . [and l]eft shoulder pain." (R. at 554.)

However, two weeks later, on September 8, Plaintiff denied any joint stiffness or muscle pain to his cardiologist, Dr. K. Bahuja. (R. at 580.) And on December 2, 2009, Plaintiff reported decreased pain at four out of ten in his left shoulder and three out of ten in his cervical and lumbosacral spine. (R. at 569.) He claimed his left knee pain was six out of ten, which was treated by an injection of Marcaine[12] and Kenalog[13] after an x-ray showed "moderate to severe

---

[11] Foot drop means "difficulty lifting the front part of the foot. If you have foot drop, you may drag the front of your foot on the ground when you walk. Foot drop is[ not] a disease. Rather, foot drop is a sign of an underlying neurological, muscular or anatomical problem." *Foot drop*, Mayo Clinic, http://www.mayoclinic.com/health/foot-drop/DS01031 (last updated Nov. 10, 2011).

[12] Bupivacaine (brand name Marcaine) is a local anesthetic injected into a wound or surgical cut to block pain in a small area for a short time. *Pain medications after surgery*, Mayo Clinic, http://www.mayoclinic.com/health/pain-medications/PN00060 (last updated Mar. 19, 2011).

degenerative changes" to the joint lines. (R. at 569–570.) Dr. Chand characterized the remaining shoulder, back, and knee issues as "mild," "very mild," or "minimal." (R. at 569.)

Meanwhile, on April 29, 2009, Plaintiff's physician Dr. Leonard Buccellato found "very mild restriction" after Plaintiff's pulmonary function tests came back almost entirely normal or in the "mildly low" range. (R. at 530, 535.) He also found asthma with allergic rhinitis and obstructive sleep apnea to be likely. (R. at 530.) Later at the same clinic, Dr. Fadi Layous diagnosed obstructive sleep apnea upon interpreting Plaintiff's July and September 2009 sleep evaluations. (R. 608–611.) He recommended CPAP; weight loss; and avoidance of sedatives, hypnotics, and alcohol. (R. at 609, 611.)

At a January 14, 2010, rheumatological consultation with Plaintiff's physician Dr. Keith Reich, Plaintiff denied swelling of his joints, but noted that his morning stiffness lasted for hours to all day. (R. at 605.) He reported a recent fluid-draining procedure on his left knee and short-term pain relief through therapy. (*Id*.) Overall, Dr. Reich diagnosed Plaintiff with left shoulder osteoarthritis with possible rotator cuff disease, knee osteoarthritis, "[c]hronic low back pain, which may be secondary to degenerative disc disease," evidence of thoracolumbar curvature, hypertension, chronic obstructive pulmonary disease, and sleep apnea. (R. at 607.) He suggested an MRI on Plaintiff's back and left shoulder, with a possible epidural to treat the chronic back pain, as well as an aquatics program, which Plaintiff agreed to attend. (*Id*.)

Aside from the medical treatment, Plaintiff stopped drinking alcohol in 2004 after forty years of heavy consumption. (R. at 58–59.) He claimed the drinking prevented him from feeling pain, which is why he could still work until that time. (R. at 59.) Plaintiff also stopped smoking in 2005 because he was wheezing and "couldn't breathe anymore." (R. at 58.) He then lost forty

---

[13] Triamcinolone (brand name Kenalog) is a corticosteroid injected to treat inflammation, certain types of arthritis, and other medical problems. *Triamcinolone (Injection Route)*, Mayo Clinic, http://www.mayoclinic.com/health/drug-information/DR603383 (last updated Nov. 1, 2011).

8

pounds between 2007 and 2009 on a doctor-ordered diet. (R. at 56–57.) But by February 2010, Plaintiff had not started exercising. (R. at 56–58.) His reason was that the State was not yet paying for his recently recommended water aerobics classes (*id.*), even though Dr. Bahuja had advised him to do aerobic exercise since December 2007 (R. at 541).[14]

**(3)** *Vocational Expert's Testimony*

Vocational expert Richard Fischer ("VE") testified at Plaintiff's February 19, 2010, hearing before the ALJ. (R. at 95–99.) The VE classified Plaintiff's former job as an automobile salesperson as skilled, light work. (R. at 97.) The ALJ proposed a hypothetical of an individual of Plaintiff's age (58), education (eighth grade), and work experience (20 years in car sales), given no exertional limitations for light work, "but the postural limitations would be climbing ropes or stairs occasionally and climbing ladders, ropes or scaffolds, never." (R. at 98.) The VE opined that Plaintiff could still perform his past relevant work of automobile sales with these limitations. (*Id.*) He also confirmed that Plaintiff could not return to that work if he were limited to unskilled work. (R. at 99.)

**(4)** *ALJ's Decision*

On May 21, 2010, the ALJ determined that Plaintiff was not disabled and was thus not

---

[14] This opinion will not discuss medical expert Dr. Walter Miller's testimony from the February 19, 2010, ALJ hearing. Although the Commissioner briefly mentioned this testimony in his response brief (DE 24 at 10), and indeed the ALJ did hear Dr. Miller's testimony, there is no evidence that she relied upon it in her decision. Thus, the Court will also refrain from relying upon it in this appeal. *See, e.g., Golembiewski v. Barnhart*, 382 F.3d 721, 725 (7th Cir. 2004) ("'[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.'" (quoting *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003))).

9

entitled to Disability Insurance Benefits or Supplemental Security Income disability benefits. (R. at 26.) To support her decision, the ALJ found as follows:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2009. (R. at 19.)

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of April 30, 2004, through his date last insured of December 31, 2009 (20 C.F.R. 404.1571 *et seq.*). (*Id.*)

3. Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the lumbar spine; obesity; status-post surgery on the left ankle; and arthritis (20 C.F.R. 404.1520(c)). (*Id.*)

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526). (R. at 20.)

5. Through the date last insured, the claimant had the RFC to perform light work, as defined in 20 C.F.R. 404.1567(b), except that the claimant should only occasionally climb stairs or ramps and should never climb ladders, ropes, or scaffolds. (*Id.*)

6. Through the date last insured, the claimant was capable of performing his past relevant work as an automobile salesperson. This work did not require the performance of work-related activities precluded by the claimant's RFC (20 C.F.R. 404.1565). (R. at 25.)

7. The claimant was not under a disability, as defined in the Social Security Act, at

any time from April 30, 2004, the alleged onset date, through December 31, 2009, the date last insured (20 C.F.R. 404.1520(f)). (R. at 26.)

**C. Standard of Review**

This Court has the authority to review Social Security Act claim decisions under 42 U.S.C. § 405(g). The Court will uphold an ALJ's decision if it is reached under the correct legal standard and supported by substantial evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This Court will not reconsider facts, re-weigh the evidence, resolve conflicts in the evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). This Court will, however, ensure that the ALJ built an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may access the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

**D. Disability Standard**

To qualify for DIB or SSI benefits, the claimant must establish that he suffers from a disability. A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A). The Social Security Administration established a five-step inquiry to evaluate whether a claimant qualifies for disability benefits. A successful claimant must show:

> (1) he is not presently employed; (2) his impairment is severe; (3) his impairment is listed or equal to a listing in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) he is not able to perform her past relevant work; and (5) he is unable to perform any other work within the national and local economy.

*Scheck v. Barnhart,* 357 F.3d 697, 699–700 (7th Cir. 2004).

An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter,* 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

**E. Analysis**

Plaintiff asserts two issues upon appeal: (1) whether the ALJ legally erred in her assessment of Plaintiff's credibility; and (2) whether the ALJ legally erred in her assessment of Plaintiff's RFC. (DE 21 at 7.) As to credibility, the ALJ,

> [a]fter careful consideration of the evidence, . . . f[ou]nd that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(R. at 21.) She also concluded that, through Plaintiff's date last insured of December 31, 2009, Plaintiff had an RFC to perform light work with the exception of only occasionally climbing stairs and ramps and never climbing ladders, ropes, and scaffolds. (R. at 20.)

This Court must decide whether the ALJ's credibility and RFC assessments were reached under the correct legal standard and supported by substantial evidence—that is, evidence that is relevant and reasonably adequate to support the ALJ's conclusions. *See Briscoe*, 425 F.3d at 351; *Richardson*, 402 U.S. at 401. For the reasons explained below, the Court affirms the ALJ's decision and the Commissioner's subsequent denial of Plaintiff's DIB and SSI benefits.

**(1)** *The ALJ did not legally err in her assessment of Plaintiff's credibility.*

Plaintiff claims the ALJ legally erred in her assessment of Plaintiff's credibility because she used "conclusory" boilerplate that was unsupported by the evidence, and she placed too much weight on the objective medical evidence without fully considering Plaintiff's subjective complaints. (DE 21 at 8–10.) The Court disagrees with Plaintiff and finds that the ALJ sufficiently supported her boilerplate statement with specific facts from the record and that the ALJ sufficiently considered both the objective and subjective evidence before concluding that Plaintiff's complaints were not entirely credible.

In recent years, the Seventh Circuit has criticized Social Security Administration ALJs for the use of "opaque" and "meaningless" boilerplate in decisions denying disability benefits without articulating specific factual support. *Bjornson v. Astrue*, 671 F.3d 640, 644 (7th Cir. 2012); *Parker v. Astrue*, 597 F. 3d 920, 922 (7th Cir. 2010). But "[w]hile this sort of boilerplate is inadequate, *by itself*, to support a credibility finding, . . . its use[ ] does not make a credibility determination invalid. Not supporting a credibility determination with explanation and evidence from the record does." *Adams v. Astrue*, 880 F. Supp. 2d 895, 906 (N.D. Ill. 2012) (emphasis in

13

original) (citing *Richison v. Astrue*, 462 Fed. Appx. 622, 625 (7th Cir. 2012); *Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011); *Parker*, 597 F.3d at 921–922).

The Seventh Circuit has also clarified that, "[b]ecause the ALJ is in the best position to observe witnesses, we will not disturb her credibility determinations as long as they find some support in the record." *Dixon v. Massanari*, 270 F.3d 1171, 1178–79 (7th Cir. 2001); *see also Brown v. Astrue*, 2012 U.S. Dist. LEXIS 129202, *31 (N.D. Ind. Sept. 11, 2012). Likewise, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (citation omitted); *see also Brown*, 2012 U.S. Dist. LEXIS 129202, at *31. "Patently wrong" is a high burden. *Turner v. Astrue*, 390 Fed. Appx. 581, 587 (7th Cir. 2010). "An ALJ's credibility determination need not be flawless." *Adams*, 880 F. Supp. 2d at 905 (citing *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2008)). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be 'patently wrong' . . . and deserving of reversal." *Elder v. Astrue*, 529 F.3d 408, 413–414 (7th Cir. 2008) (citations omitted).

Here the ALJ determined that Plaintiff had the RFC to perform light work, with only occasionally climbing stairs and ramps and never climbing ladders, ropes, and scaffolds. (R. at 20.) Thereafter, the ALJ summarized her findings using the following boilerplate language:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(R. at 21.) The issue is, thus, whether the ALJ supported this statement with an explanation and sufficient evidence from the record, and the Court finds that she did.

Throughout the ALJ's six-page RFC assessment, she provided detail after detail from the

14

record to support her conclusion that Plaintiff's subjective complaints were not credible in light of the whole record. For example, when Plaintiff claimed that his pain and the side effects of his pain medication allowed him to perform only simple, unskilled work, the ALJ disagreed because Plaintiff only used over-the-counter medication from 2004 to 2006; he indicated that he had no side effects while on medications; and he testified that "he can take care of all of his daily personal care needs and grooming independently[,] he walks in the forest preserve near his home on occasion[,] he visits his grandchildren[,] he drives on occasion[,] he goes out to eat with his girlfriend[,] he puts dishes in the dishwasher[,] and he goes to therapy." (*Id*.)

The ALJ then considered Southeastern Medical Center's records from 2006 to 2009, which were "generally good reports" of normal or not serious test results and improved functioning through treatment. (R. at 22.) The ALJ extensively discussed Plaintiff's back and leg problems, referencing terms from the records like "mild," "possible," "no evidence of," and "within normal reference limits." (R. at 21–24.) She recognized Plaintiff's July and August 2007 diagnoses of lumbar spine osteoarthritis and lumbar radiculopathy, but noted that Plaintiff's own treating physician at that time described "only 'mild' stiffness, 'minimal' swelling, and 'mild' patellofemoral crepitus in [Plaintiff]'s knees." (R. at 22.) The ALJ also acknowledged Plaintiff's claimed shoulder, knee, and ankle pain, but saw that, in 2007, it was "treated conservatively with physical therapy[,] . . . support (braces), Relafen, and Methocarbamol," as well as a cane. (*Id*.) Accordingly, she noted a September 2007 RFC questionnaire, in which Dr. Chand indicated that Plaintiff "often (as opposed to frequently or constantly) experience[d] pain that was severe enough to interfere with his attention and concentration." (R. at 25.)

And although Plaintiff's doctors claimed in July 2008 that he could not work, in both December 2007 and September 2009, Plaintiff told them that he had no joint stiffness or muscle

15

pain. (R. at 22–23.) Additionally, the ALJ found it significant that, in August 2009, Dr. Chand recorded that Plaintiff's "cervical spine showed satisfactory range of motion, had no abnormal curvature, and had no spasms in the paraspinal muscles." (R. at 23.) These facts, plus "the relatively conservative treatment that Dr. Chand continued to pursue," did not compute for the ALJ with Dr. Chand's opinion that Plaintiff remained disabled in 2009. (*Id.*)

Likewise, the ALJ discussed Plaintiff's cardiovascular issues, including blood pressure that was "under good control," an "unremarkable" adenosine stress test, "trivial" heart and lung problems, and "rare" heart palpitations. (R. at 22.) She found it significant that Plaintiff's doctor instructed him to start an exercise regimen including aerobic exercises, which was "consistent with a light exertional level functional assessment." (*Id.*) And despite Plaintiff's "likely" asthma with allergic rhinitis and obstructive sleep apnea, which was treated at home with CPAP, his "breath sounds were clear to auscultation." (R. at 23–24.)

Still it is important that the ALJ did not just cherry pick facts which supported a denial of the disability benefits. She also recognized the parts of Dr. Chand's September 2007 RFC questionnaire indicating that Plaintiff could only stand for thirty minutes before needing to sit or walk around, sit for one to two hours at a time, and walk one city block without resting or experiencing severe pain, and that he needed a cane when standing or walking. (R. at 25.) She noted Dr. McFarland's similar report in 2008. (*Id.*) And she acknowledged that, by 2009, there were "'mild to moderate' degenerative changes in his left shoulder AC joint, moderate to severe degenerative changes mainly to the medial joint line and patellofemur, . . . chronic left shoulder pain[,] lumbar radiculopathy[,] and obesity." (R. at 23.)

In short, the ALJ's potentially problematic boilerplate language regarding Plaintiff's lack of credibility was acceptable in this case because she supported her conclusion with substantial

16

subjective, objective, favorable, and unfavorable evidence from the record as a whole. Therefore, she did not legally err in her assessment of Plaintiff's credibility.

**(2)** *The ALJ did not legally err in her assessment of Plaintiff's RFC.*

The ALJ did not rely solely on the opinions of State agency physicians Dr. Siddiqui (R. at 24) and Dr. Neal (R. at 24–25) to find Plaintiff's RFC of light work with some limitations. Plaintiff cites *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003), for the proposition that "[a]n ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." However, Dr. Siddiqui did examine Plaintiff (R. at 348–351), so this argument cannot apply to him. And in order to reject the other treating doctors' opinions, the ALJ only needed to find contrary "substantial evidence," which is "'more than a scintilla' but less than a preponderance of the evidence, and is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001) (citations omitted).

Here the ALJ thoroughly discussed years of records from Plaintiff's own physicians Dr. McFarland (R. at 22, 25), P.A. Rashidi (R. at 22), Dr. Bahuja (R. at 22–23), Dr. Buccellato (R. at 23), Dr. Reich (R. at 24), and primary physician, Dr. Chand (R. at 22–25). The ALJ considered test results, treatment plans, and office notes detailing Plaintiff's complaints and the doctors' observations, all which provided fluctuating and often minor evidence of the severity and limiting effects of Plaintiff's conditions, in contrast with the doctors' repeated assertions of his disability. The ALJ explained all of these reasons before deciding to "give the opinions and

17

assessments of Dr. Chand [and others] minimal weight as they are not supported by the objective medical evidence as a whole, including his own treatment notes," and to "give Dr. Neal's opinions and assessments great weight because they are consistent with the objective medical evidence." (R. at 25.) Because the ALJ satisfied the requirement of providing "substantial evidence" opposing the treating physicians' opinions, this Court will not overturn her RFC assessment, in line with Dr. Neal's advice, of light work with some limitations.

The above examples reflect the Court's overall impression of the ALJ's RFC assessment: the ALJ considered and relied upon sufficient subjective, objective, favorable, and unfavorable evidence in the record in order to determine that Plaintiff's complaints were not entirely credible and that he could still perform limited light work, which would not preclude him from continuing in his car salesman job. (*Id.*) She adequately supported her boilerplate statement regarding Plaintiff's credibility with extensive facts from the record in a six-page analysis. It is not the Court's job to reconsider those facts, re-weigh the evidence, resolve conflicts in the evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles*, 395 F.3d at 425. Rather, the Court is affirming the ALJ's decision and the subsequent denial of Plaintiff's disability benefits by the Commissioner because the ALJ built an "accurate and logical bridge from the evidence to [her] conclusion," *see Scott*, 297 F.3d at 595, and because her decision was supported by substantial evidence from the record as a whole.

**F. Conclusion**

The Court finds that the ALJ did not err in her assessment of Plaintiff's credibility or RFC. Because the ALJ supported her conclusions with substantial evidence from the record as a

whole, the Commissioner's denial of Plaintiff's Disability Insurance Benefits and Supplemental Security Income disability benefits is affirmed.

SO ORDERED on March 27, 2013.

    S/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE